Case 2:16-cv-01655-RAJ   Document 9-1   Filed 11/16/16   Page 1 of 14

FILED
LODGED
RECEIVED

MAIL

NOV 16 2016

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                                DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

KYLE LYDELL CANTY
VS.
    Plaintiff,

KING COUNTY, et al
    defendants.

Case No 2:16-CV-01655-RAJ-JPD

F.R.C.P. RULE 5.1

Pursuant to F.R.C.P Rule 5.1 (A) Notice by a party (1), (B), (2), All Rules where followed by Mr. Canty, Mr. Canty is in reciept of typed sighed letter coming from the Attorney Generals office Scott A. Marlow assistant Attorney General responds back by saying "The United States Attorney's office recently investigated the Seattle police department for Fourth amendment Constitutional violations

P 1 of 2

Exhibit from Assistant Attorney General Scott A. Marlow attached along with the no probable cause for Mr. Canty's arrest crime bulletin coming from the Seattle Police department Exhibit also attached.

Prepared by:

K  11/10/2016
Kyle Lydell Canty
BA# 216020036
King County Jail
500 5th AV
Seattle WA 98104

P 2 of 2

WESTLAW

**Rule 5.1. Constitutional Challenge to a Statute--Notice, Certification, and Intervention**
United States Code Annotated    Federal Rules of Civil Procedure for the United States District Courts    *(Approx. 2 pages)*

> United States Code Annotated
>  Federal Rules of Civil Procedure for the United States District Courts (Refs & Annos)
>   Title II. Commencing an Action; Service of Process, Pleadings, Motions, and Orders

Federal Rules of Civil Procedure Rule 5.1

Rule 5.1. Constitutional Challenge to a Statute--Notice, Certification, and Intervention

Currentness

**(a) Notice by a Party.** A party that files a pleading, written motion, or other paper drawing into question the constitutionality of a federal or state statute must promptly:

 (1) file a notice of constitutional question stating the question and identifying the paper that raises it, if:

  **(A)** a federal statute is questioned and the parties do not include the United States, one of its agencies, or one of its officers or employees in an official capacity; or

  **(B)** a state statute is questioned and the parties do not include the state, one of its agencies, or one of its officers or employees in an official capacity; and

 (2) serve the notice and paper on the Attorney General of the United States if a federal statute is questioned--or on the state attorney general if a state statute is questioned--either by certified or registered mail or by sending it to an electronic address designated by the attorney general for this purpose.

**(b) Certification by the Court.** The court must, under 28 U.S.C. § 2403, certify to the appropriate attorney general that a statute has been questioned.

**(c) Intervention; Final Decision on the Merits.** Unless the court sets a later time, the attorney general may intervene within 60 days after the notice is filed or after the court certifies the challenge, whichever is earlier. Before the time to intervene expires, the court may reject the constitutional challenge, but may not enter a final judgment holding the statute unconstitutional.

**(d) No Forfeiture.** A party's failure to file and serve the notice, or the court's failure to certify, does not forfeit a constitutional claim or defense that is otherwise timely asserted.

**CREDIT(S)**
 (Adopted April 12, 2006, effective December 1, 2006; amended April 30, 2007, effective December 1, 2007.)

**ADVISORY COMMITTEE NOTES**
2006 Adoption

Rule 5.1 implements 28 U.S.C. § 2403, replacing the final three sentences of Rule 24(c). New Rule 5.1 requires a party that files a pleading, written motion, or other paper drawing in question the constitutionality of a federal or state statute to file a notice of constitutional question and serve it on the United States Attorney General or state attorney general. The party must promptly file and serve the notice of constitutional question. This notice requirement supplements the court's duty to certify a constitutional challenge to the United States Attorney General or state attorney general. The notice of constitutional question will ensure that the attorney general is notified of constitutional challenges and has an opportunity to exercise the statutory right to intervene at the earliest possible point in the litigation. The court's certification obligation remains, and is the only notice when the constitutionality of a federal or state statute is drawn in question by means other than a party's pleading, written motion, or other paper.

Moving the notice and certification provisions from Rule 24(c) to a new rule is designed to attract the parties' attention to these provisions by locating them in the vicinity of the rules that require notice by service and pleading.

Exhibit
F.R.C.P Rule
5.1



Bob Ferguson
# ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue #2000 • Seattle WA 98104-3188

October 13, 2016

Mr. Kyle Canty
Booking # 216020036
King County Correctional Facility
500 Fifth Avenue
Seattle, WA 98104-2332

RE: **SPD Complaint**

Dear Mr. Canty:

I am an Assistant Attorney General in the Criminal Justice Division and have been asked to respond to your inquiry sent to the Office of the Attorney General. In your correspondence you express concern over what you believe to be a pattern of harassment of yourself perpetrated by the Seattle Police Department and facilitated by the King County Prosecuting Attorney and the Judges of the King County Superior Court. You ask for assistance from my office to help you address these concerns.

Unfortunately, I am unable to be of assistance. The Attorney General of Washington does not have the authority or jurisdiction to involve itself in the internal workings of local political subdivisions such as the police, county prosecuting attorney and courts. I would suggest that you contact either the Office of Professional Accountability at the Seattle Police Department or the United States Attorney's Office (they recently investigated the Seattle Police Department for allegations similar to those you make in your letter) to voice your concerns.

I am sorry that I was unable to be of more direct assistance, but hope that you understand the role that my office is legally bound to play in such matters.

Sincerely,

*[signature]*

**SCOTT A. MARLOW**
Assistant Attorney General

18

*Exhibit of fourth amendment violation (NO probable cause)*



# Criminal Information Bulletin
## Criminal Intelligence Section

Headquarters | Date: 7/8/2016

Bulletin prepared by: Detective Renihan — Phone: (206) 684-8770

## OFFICER SAFETY BULLETIN

### THREATS TO SHOOT POLICE OFFICERS/CRISIS



KYLE L. CANTY  B/M/7-20-85  5'07"/160
LKA: 77 S.Washington
NO Known vehicles

*There is no probable Cause for his Arrest.*

THERE IS A HAZARD IN NCIC RECORD IN NCIC FOR THREATENING TO SHOOT OFFICERS.

THIS INFORMATION IS PROVIDED FOR OFFICER SAFETY DUE TO HIS ACTIONS/WORDS AND ESCALATING ANGER AND FOCUS ON THE POLICE.

On 7-2-16 — Canty approached an SPD officer on a call and yelled obscenities. Canty stated that he would assault officers if they tried to put hands on him for any reason.

On 7-5-16 — Canty approached SPD Officers at a Starbucks and was videotaping them. Canty made the statements "you want a war with me, you don't want a war with me". "I know where you guys hang out stop harassing me" "do you know about the gun laws in the state of Washington". "It's in your best interest to stop harassing me".

On 7-7-16 — Canty went to the Seattle Police Department OPA office saying he was feeling harassed and threatened by police. He stated that he planned to purchase a firearm to defend himself. He said he would shoot officers if they pulled a gun or taser on him without a warrant.

On 7-7-16 — Canty called the US Attorney's office in Seattle and became upset with the receptionist and stated that he would "start shooting SPD officers if he doesn't get the help he wants". He then called back and left a message that he feels his life has been threatened by the police department and he will protect himself by using deadly force".

CONFIDENTIAL - POLICE USE ONLY - DISPOSE OF IN SHREDDER ONLY

NOT FOR PUBLIC DISPLAY OR DISTRIBUTION — DO NOT FORWARD OR COPY

Page 1 of 1

that the application satisfies the requirements for issuance of a warrant, as provided in section (c) of this rule, the court shall issue a subpoena duces tecum in accordance with CR 45(b).

(3) *Warrant.* If the court determines that the application satisfies the requirements for issuance of a warrant and that RCW 10.79.015(3) and 42 U.S.C. §§ 2000aa et seq. permit issuance of a search warrant rather than a subpoena duces tecum, the court may issue a warrant.

## Credits

[Amended effective September 1, 1983; September 1, 1986; September 1, 1995; September 1, 2014.]

## Editors' Notes

**COMMENT--1973**

Supersedes RCW 10.79.010, .030.

**COMMENT--1986**

The addition of cautionary language regarding the use of hearsay evidence in making a finding of probable cause is identical to the amendment proposed for CrR 2.2(a). A similar warning is presently found in CrR 4.7(b)(2). The committee was concerned that a rule user might be misled into believing that CrR 2.3(c) codified all the decisional law governing the use of hearsay evidence. The proposed change will provide a warning to consult case law or otherwise make an examination beyond the rule.

The remaining amendments to sections (c), (d), and (e) reflect the committee's decisions on style. The committee decided to substitute "court" for "judge", and to change gender-specific pronouns in rules which were otherwise being amended.

Notes of Decisions (359)

CrR 2.3, WA ST SUPER CT CR CrR 2.3
Annotated Superior Court Criminal Rules, including the Special Proceedings Rules -- Criminal, Criminal Rules for Courts of Limited Jurisdiction, and the Washington Child Support Schedule Appendix are current with amendments received through 6/15/16. Notes of decisions annotating these court rules are current through current cases available on Westlaw. Other state rules are current with amendments received through 6/15/16.

**End of Document**          © 2016 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext © 2016 Thomson Reuters

THOMSON REUTERS



# WESTLAW

**Younger v. Harris**
Supreme Court of the United States | February 23, 1971 | 401 U.S. 37 | 91 S.Ct. 746 | 27 L.Ed.2d 669 | *(Approx. 13 pages)*

Declined to Extend by Sprint Communications, Inc. v. Jacobs, U.S., December 10, 2013

91 S.Ct. 746
Supreme Court of the United States

Evelle J. YOUNGER, Appellant,
v.
John HARRIS, Jr., et al.

No. 2.
Reargued Nov. 16, 1970.
Decided Feb. 23, 1971.

Action challenging constitutionality of California's Criminal Syndicalism Act. A three-judge United States District Court for the Central District of California, held the act impermissibly vague and overbroad and unconstitutional on its face, 281 F.Supp. 507, and issued injunction, and defendant district attorney appealed. The Supreme Court, Mr. Justice Black, held that even if the California Criminal Syndicalism Act under which one of the plaintiffs was being prosecuted was unconstitutional, he was not entitled to federal court equitable relief against prosecution in state court where the injury which he faced was solely that incidental to every criminal proceeding brought lawfully and in good faith.

Reversed and remanded.

Mr. Justice Brennan filed an opinion in which Mr. Justice White and Mr. Justice Marshall joined, concurring in result.

For separate concurring opinion of Mr. Justice Stewart in which Mr. Justice Harlan joined see 91 S.Ct. 756.

For separate dissenting opinion of Mr. Justice Douglas, see 91 S.Ct. 760.

## West Headnotes (13)

## Attorneys and Law Firms

**747 *38** Clifford K. Thompson, Jr., San Francisco, Cal., for appellant.

A. L. Wirin, Los Angeles, Cal., for appellees.

## Opinion

Mr. Justice BLACK delivered the opinion of the Court.

Appellee, John Harris, Jr., was indicted in a California state court, charged with violation of the California Penal Code ss 11400 and 11401, known as the California Criminal Syndicalism Act, set out below.[1] He then filed *39 a **748 complaint in the Federal District Court, asking that court to enjoin the appellant, Younger, the District Attorney of Los Angeles County, from prosecuting him, and alleging that the prosecution and even the presence of the Act inhibited him in the exercise of his rights of free speech and press, rights guaranteed him by the First and Fourteenth Amendments. Appellees Jim Dan and Diane Hirsch intervened as plaintiffs in the suit, claiming that the prosecution of Harris would inhibit them as members of the Progressive Labor Party from peacefully advocating the program of their party, which was to replace capitalism with socialism and to abolish the profit system of production in this country. Appellee Farrell Broslawsky, an instructor in history at Los Angeles Valley College, also intervened claiming that the prosecution of Harris made him uncertain as to whether he could *40 teach about the doctrines of Karl Marx or read from the Communist Manifesto as part of his classwork. All claimed that unless the United States court restrained the state prosecution of Harris each would suffer immediate and irreparable injury. A three-judge Federal District Court, convened pursuant to 28 U.S.C. s 2284, held that it had jurisdiction and power to restrain the District Attornney from prosecuting, held that the State's Criminal Syndicalism Act was void for vagueness and

overbreadth in violation of the First and Fourteenth Amendments, and accordingly restrained the District Attorney from 'further prosecution of the currently pending action against plaintiff **Harris** for alleged violation of the Act.' 281 F.Supp. 507, 517 (1968).

[1] [2] The case is before us on appeal by the State's District Attorney **Younger**, pursuant to 28 U.S.C. s 1253. In his notice of appeal and his jurisdictional statement appellant presented two questions: (1) whether the decision of this Court in Whitney v. California, 274 **U.S.** 357, 47 S.Ct. s 641, 71 L.Ed. 1095, holding California's law constitutional in 1927 was binding on the District Court and (2) whether the State's law is constitutional on its face. In this Court the brief for the State of California, filed at our request, also argues that only **Harris**, who was indicted, has standing to challenge the State's law, and that issuance of the injunction was a violation of a longstanding judicial policy and of 28 U.S.C. s 2283, which provides:

> 'A court of the United States may not grant an injunction to stay proceedings **\*\*749** in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.'

See, e.g., Atlantic Coast Line R. Co. v. Engineers, 398 **U.S.** 281, 285—286, 90 S.Ct. 1739, 1742—1743, 26 L.Ed.2d 234 (1970). Without regard to the questions **\*41** raised about Whitney v. California, supra, since overruled by Brandenburg v. Ohio, 395 **U.S.** 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969), or the constitutionality of the state law, we have concluded that the judgment of the District Court, enjoining appellant **Younger** from prosecuting under these California statutes, must be reversed as a violation of the national policy forbidding federal courts to stay or enjoin pending state court proceedings except under special circumstances.[2] We express no view about the circumstances under which federal courts may act when there is no prosecution pending in state courts at the time the federal proceeding is begun.

I

[3] [4] [5] Appellee **Harris** has been indicted, and was actually being prosecuted by California for a violation of its Criminal Syndicalism Act at the time this suit was filed. He thus has an acute, live controversy with the State and its prosecutor. But none of the other parties plaintiff in the District Court, Dan, Hirsch, or Broslawsky, has such a controversy. None has been indicted, arrested, or even threatened by the prosecutor. About these three the three-judge court said:

'Plaintiffs Dan and Hirsch allege that they are members of the Progressive Labor Party, which advocates change in industrial ownership and political change, and that they feel inhibited in advocation **\*42** the program of their political party through peaceful, nonviolent means, because of the presence of the Act 'on the books', and because of the pending criminal prosecution against **Harris**. Plaintiff Broslawsky is a history instructor, and he alleges that he is uncertain as to whether his normal practice of teaching his students about the doctrines of Karl Marx and reading from the Communist Manifesto and other revolutionary works may subject him to prosecution for violation of the Act.' 281 F.Supp., at 509.

Whatever right **Harris**, who is being prosecuted under the state syndicalism law may have, Dan, Hirsch, and Broslawsky cannot share it with him. If these three had alleged that they would be prosecuted for the conduct they planned to engage in, and if the District Court had found this allegation to be true—either on the admission of the State's district attorney or on any other evidence—then a genuine controversy might be said to exist. But here appellees Dan, Hirsch, and Broslawsky do not claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible. They claim the right to bring this suit solely because, in the language of their complaint, they 'feel inhibited.' We do not think this allegation even if true, is sufficient to bring the equitable jurisdiction of the federal courts into play to enjoin a pending state prosecution. A federal lawsuit to stop a prosecution in a state court is a serious matter. And persons having no fears of state prosecution except those that are imaginary or speculative, are not to be accepted as appropriate plaintiffs in such cases. See **\*\*750** Golden v. Zwickler, 394 **U.S.** 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969). Since **Harris** is actually being prosecuted under the challenged laws, however, we proceed with him as a proper party.

**\*43** II

[6] Since the beginning of this country's history Congress has, subject to few exceptions, manifested a desire to permit state courts to try state cases free from interference by

federal courts. In 1793 an Act unconditionally provided: '(N)or shall a writ of injunction be granted to stay proceedings in any court of a state * * *.' 1 Stat. 335, c. 22, s 5. A comparison of the 1793 Act with 28 U.S.C. s 2283, its present-day successor, graphically illustrates how few and minor have been the exceptions granted from the flat, prohibitory language of the old Act. During all this lapse of years from 1793 to 1970 the statutory exceptions to the 1793 congressional enactment have been only three; (1) 'except as expressly authorized by Act of Congress'; (2) 'where necessary in aid of its jurisdiction'; and (3) 'to protect or effectuate its judgments.' In addition, a judicial exception to the longstanding policy evidenced by the statute has been made where a person about to be prosecuted in a state court can show that he will, if the proceeding in the state court is not enjoined, suffer irreparable damages. See Ex parte Young, 209 **U.S**. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).[3]

The precise reasons for this longstanding public policy against federal court interference with state court proceedings have never been specifically identified but the primary sources of the policy are plain. One is the basic doctrine of equity jurisprudence that courts of equity should not act, and particularly should not act to restrain a criminal prosecution, when the moving party has an adequate remedy at law and will not suffer irreparable *44 injury if denied equitable relief. The doctrine may originally have grown out of circumstances peculiar to the English judicial system and not applicable in this country, but its fundamental purpose of restraining equity jurisdiction within narrow limits is equally important under our Constitution, in order to prevent erosion of the role of the jury and avoid a duplication of legal proceedings and legal sanctions where a single suit would be adequate to protect the rights asserted. This underlying reason for restraining courts of equity from interfering with criminal prosecutions is reinforced by an even more vital consideration, the notion of 'comity,' that is, a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways. This, perhaps for lack of a better and clearer way to describe it, is referred to by many as 'Our Federalism,' and one familiar with the profound debates that ushered our Federal Constitution into existence is bound to respect those who remain loyal to the ideals and dreams of 'Our Federalism.' The concept does not mean blind deference to 'States' Rights' any more than it means centralization of control over every important issue in our National Government and its courts. The Framers rejected both these courses. What the concept does represent is a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the **751 States. It should never be forgotten that this slogan, 'Our Federalism,' born in the early struggling days of *45 our Union of States, occupies a highly important place in our Nation's history and its future.

This brief discussion should be enough to suggest some of the reasons why it has been perfectly natural for our cases to repeat time and time again that the normal thing to do when federal courts are asked to enjoin pending proceedings in state courts is not to issue such injunctions. In Fenner v. Boykin, 271 **U.S**. 240, 46 S.Ct. 492, 70 L.Ed. 927 (1926), suit had been brought in the Federal District Court seeking to enjoin state prosecutions under a recently enacted state law that allegedly interfered with the free flow of interstate commerce. The Court, in a unanimous opinion made clear that such a suit, even with respect to state criminal proceedings not yet formally instituted, could be proper only under very special circumstances:

'Ex parte Young, 209 **U.S**. 123, 28 S.Ct. 441, 52 L.Ed. 714, and following cases have established the doctrine that, when absolutely necessary for protection of constitutional rights, courts of the United States have power to enjoin state officers from instituting criminal actions. But this may not be done, except under extraordinary circumstances, where the danger of irreparable loss is both great and immediate. Ordinarily, there should be no interference with such officers; primarily, they are charged with the duty of prosecuting offenders against the laws of the state, and must decide when and how this is to be done. The accused should first set up and rely upon his defense in the state courts, even though this involves a challenge of the validity of some statute, unless it plainly appears that this course would not afford adequate protection.' Id., at 243—244, 46 S.Ct. at 493.

These principles, made clear in the Fenner case, have been repeatedly followed and reaffirmed in other cases involving threatened prosecutions. See, e.g., Spielman Motor Sales Co. v. Dodge, 295 **U.S**. 89, 55 S.Ct. 678, 79 L.Ed. 1322 (1935); Beal v. Missouri

Pac. R. Co., 312 **U.S.** 45, 61 S.Ct. 418, 85 L.Ed. 577 (1941); Watson v. Buck, 313 **U.S.** 387, 61 S.Ct. 962, 85 L.Ed. 1416 (1941); Williams v. Miller, 317 **U.S.** 599, 63 S.Ct. 258, 87 L.Ed. 489 (1942); Douglas v. City of Jeannette, 319 **U.S.** 157, 63 S.Ct. 877, 87 L.Ed. 1324 (1943).

7   *\*46* In all of these cases the Court stressed the importance of showing irreparable injury, the traditional prerequisite to obtaining an injunction. In addition, however, the Court also made clear that in view of the fundamental policy against federal interference with state criminal prosecutions, even irreparable injury is insufficient unless it is 'both great and immediate.' Fenner, supra. Certain types of injury, in particular, the cost, anxiety, and inconvenience of having to defend against a single criminal prosecution, could not by themselves be considered 'irreparable' in the special legal sense of that term. Instead, the threat to the plaintiff's federally protected rights must be one that cannot be eliminated by his defense against a single criminal prosecution. See, e.g., Ex parte Young, supra, 209 U.S. at 145—147, 28 S.Ct. at 447—449. Thus, in the Buck case, supra, 313 **U.S.**, at 400, 61 S.Ct., at 966, we stressed:

'Federal injunctions against state criminal statutes, either in their entirety or with respect to their separate and distinct prohibitions, are not to be granted as a matter of course, even if such statutes are unconstitutional. 'No citizen or member of the community is immune from prosecution, in good faith, for his alleged criminal acts. The imminence of such a prosecution even though alleged to be unauthorized and hence unlawful is not alone ground for relief in equity which exerts its extraordinary powers only to prevent irreparable injury to the plaintiff who seeks its aid.' *\*\*752* Beal v. Missouri Pacific Railroad Corp., 312 **U.S.** 45, 49, 61 S.Ct. 418, 420, 85 L.Ed. 577.'

*\*47* And similarly, in Douglas, supra, we made clear, after reaffirming this rule, that:

'It does not appear from the record that petitioners have been threatened with any injury other than that incidental to every criminal proceeding brought lawfully and in good faith * * *.' 319 **U.S.**, at 164, 63 S.Ct., at 881.

This is where the law stood when the Court decided Dombrowski v. Pfister, 380 **U.S.** 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965), and held that an injunction against the enforcement of certain state criminal statutes could properly issue under the circumstances presented in that case.[4] In Dombrowski, *\*48* unlike many of the earlier cases denying injunctions, the complaint made substantial allegations that:

'the threats to enforce the statutes against appellants are not made with any expectation of securing valid convictions, but rather are part of a plan to employ arrests, seizures, and threats of prosecution under color of the statutes to harass appellants and discourage them and their supporters from asserting and attempting to vindicate the constitutional rights of Negro citizens of Louisiana,' 380 **U.S.**, at 482, 85 S.Ct., at 1118—1119.

The appellants in Dombrowski had offered to prove that their offices had been raided and all their files and records seized pursuant to search and arrest warrants that were later summarily vacated by a state judge for lack of probable cause. They also offered to prove that despite the state court order quashing the warrants and suppressing the evidence seized, the prosecutor was continuing to threaten to initiate new prosecutions of appellants under the same statutes, was holding public hearings at which photostatic copies of the illegally seized documents were being used, and was threatening to use other copies of the illegally seized documents to obtain grand jury indictments against the appellants on charges of violating the same statutes. These circumstances, as viewed by the Court sufficiently establish the kind of irreparable injury, above and beyond that associated with the defense of a single prosecution brought in good faith, that had always been considered sufficient to justify federal intervention. See, e.g., Beal, supra, 312 **U.S.**, at 50, 61 S.Ct., at 421. Indeed, after quoting the Court's statement in Douglas concerning the very restricted circumstances under which an injunction could be justified, *\*\*753* the Court in Dombrowski went on to say:

'But the allegations in this complaint depict a situation in which defense of the State's criminal *\*49* prosecution will not assure adequate vindication of constitutional rights. They suggest that a substantial loss of or impairment of freedoms of expression will occur if appellants must await the state court's disposition and ultimate review in this Court of any adverse determination. These allegations, if true, clearly show irreparable injury.' 380 **U.S.**, at 485—486, 85 S.Ct., at 1120.

And the Court made clear that even under these circumstances the District Court issuing the injunction would have continuing power to lift it at any time and remit the plaintiffs to the

state courts if circumstances warranted. 380 U.S., at 491, 492, 85 S.Ct., at 1123, 1124. Similarly, in Cameron v. Johnson, 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968), a divided Court denied an injunction after finding that the record did not establish the necessary bad faith and harassment; the dissenting Justices themselves stressed the very limited role to be allowed for federal injunctions against state criminal prosecutions and differed with the Court only on the question whether the particular facts of that case were sufficient to show that the prosecution was brought in bad faith.

8   It is against the background of these principles that we must judge the propriety of an injunction under the circumstances of the present case. Here a proceeding was already pending in the state court, affording Harris an opportunity to raise his constitutional claims. There is no suggestion that this single prosecution against Harris is brought in bad faith or is only one of a series of repeated prosecutions to which he will be subjected. In other words, the injury that Harris faces is solely 'that incidental to every criminal proceeding brought lawfully and in good faith,' Douglas, supra, and therefore under the settled doctrine we have already described he is not entitled to equitable relief 'even if such statutes are unconstitutional,' Buck, supra.

9   10   *50 The District Court, however, thought that the Dombrowski decision substantially broadened the availability of injunctions against state criminal prosecutions and that under that decision the federal courts may give equitable relief, without regard to any showing of bad faith or harassment, whenever a state statute is found 'on its face' to be vague or overly broad, in violation of the First Amendment. We recognize that there are some statements in the Dombrowski opinion that would seem to support this argument. But, as we have already seen, such statements were unnecessary to the decision of that case, because the Court found that the plaintiffs had alleged a basis for equitable relief under the long-established standards. In addition, we do not regard the reasons adduced to support this position as sufficient to justify such a substantial departure from the established doctrines regarding the availability of injunctive relief. It is undoubtedly true, as the Court stated in Dombrowski, that '(a) criminal prosecution under a statute regulating expression usually involves imponderables and contingencies that themselves may inhibit the full exercise of First Amendment freedoms.' 380 U.S., at 486, 85 S.Ct., at 1120. But this sort of 'chilling effect,' as the Court called it, should not by itself justify federal intervention. In the first place, the chilling effect cannot be satisfactorily eliminated by federal injunctive relief. In Dombrowski itself the Court stated that the injunction to be issued there could be lifted if the State obtained an 'acceptable limiting construction' from the state courts. The Court then made clear that once this was done, prosecutions could then be brought for conduct occurring before the narrowing construction was made, and proper convictions could stand so long as the defendants were not deprived of fair warning. 380 U.S., at 491 n. 7, 85 S.Ct., at 1123. The kind of relief granted in Dombrowski thus does **754 not effectively eliminate uncertainty as to the coverage of the state *51 statute and leaves most citizens with virtually the same doubts as before regarding the danger that their conduct might eventually be subjected to criminal sanctions. The chilling effect can, of course, be eliminated by an injunction that would prohibit any prosecution whatever for conduct occurring prior to a satisfactory rewriting of the statute. But the States would then be stripped of all power to prosecute even the socially dangerous and constitutionally unprotected conduct that had been covered by the statute, until a new statute could be passed by the state legislature and approved by the federal courts in potentially lengthy trial and appellate proceedings. Thus, in Dombrowski itself the Court carefully reaffirmed the principle that even in the direct prosecution in the State's own courts, a valid narrowing construction can be applied to conduct occurring prior to the date when the narrowing construction was made, in the absence of fair warning problems.

Moreover, the existence of a 'chilling effect,' even in the area of First Amendment rights, has never been considered a sufficient basis, in and of itself, for prohibiting state action. Where a statute does not directly abridge free speech, but—while regulating a subject within the State's power—tends to have the incidental effect of inhibiting First Amendment rights, it is well settled that the statute can be upheld if the effect on speech is minor in relation to the need for control of the conduct and the lack of alternative means for doing so. Schneider v. State, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939); Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); United Mine Workers of America, Dist. 12 v. Illinois Bar Assn., 389 U.S. 217, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967). Just as the incidental 'chilling effect' of such statutes does not automatically render them unconstitutional, so the chilling effect that admittedly can result from the very existence of certain laws on the statute books does not in itself justify prohibiting the State from carrying out the important

*52 and necessary task of enforcing these laws against socially harmful conduct that the State believes in good faith to be punishable under its laws and the Constitution.

11  12  Beyond all this is another, more basic consideration. Procedures for testing the constitutionality of a statute 'on its face' in the manner apparently contemplated by Dombrowski, and for then enjoining all action to enforce the statute until the State can obtain court approval for a modified version, are fundamentally at odds with the function of the federal courts in our constitutional plan. The power and duty of the judiciary to declare laws unconstitutional is in the final analysis derived from its responsibility for resolving concrete disputes brought before the courts for decision; a statute apparently governing a dispute cannot be applied by judges, consistently with their obligations under the Supremacy Clause, when such an application of the statute would conflict with the Constitution. Marbury v. Madison, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803). But this vital responsibility, broad as it is, does not amount to an unlimited power to survey the statute books and pass judgment on laws before the courts are called upon to enforce them. Ever since the Constitutional Convention rejected a proposal for having members of the Supreme Court render advice concerning pending legislation[5] it has been clear that, even when suits of this kind involve a 'case or controversy' sufficient to satisfy the requirements of Article III of the Constitution, the task of analyzing a proposed statute, pinpointing its deficiencies, and requiring correction of these deficiencies before the statute is put into effect, is rarely if ever an appropriate task for the judiciary. *53 The combination of the relative remoteness of the controversy, the impact on the legislative **755 process of the relief sought, and above all the speculative and amorphous nature of the required line-by-line analysis of detailed statutes, see, e.g., Landry v. Daley, 280 F.Supp. 938 (N.D.Ill.1968), rev'd sub nom. Boyle v. Landry, 401 U.S. 77, 91 S.Ct. 758, 27 L.Ed.2d 696, ordinarily results in a kind of case that is wholly unsatisfactory for deciding constitutional questions, whichever way they might be decided. In light of this fundamental conception of the Framers as to the proper place of the federal courts in the governmental processes of passing and enforcing laws, it can seldom be appropriate for these courts to exercise any such power of prior approval or veto over the legislative process.

13  For these reasons, fundamental not only to our federal system but also to the basic functions of the Judicial Branch of the National Government under our Constitution, we hold that the Dombrowski decision should not be regarded as having upset the settled doctrines that have always confined very narrowly the availability of injunctive relief against state criminal prosecutions. We do not think that opinion stands for the proposition that a federal court can properly enjoin enforcement of a statute solely on the basis of a showing that the statute 'on its face' abridges First Amendment rights. There may, of course, be extraordinary circumstances in which the necessary irreparable injury can be shown even in the absence of the usual prerequisites of bad faith and harassment. For example, as long ago as the Buck case, supra, we indicated:

'It is of course conceivable that a statute might be flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against *54 whomever an effort might be made to apply it.' 313 U.S., at 402, 61 S.Ct., at 967.

Other unusual situations calling for federal intervention might also arise, but there is no point in our attempting now to specify what they might be. It is sufficient for purposes of the present case to hold, as we do, that the possible unconstitutionality of a statute 'on its face' does not in itself justify an injunction against good-faith attempts to enforce it, and that appellee Harris has failed to make any showing of bad faith, harassment, or any other unusual circumstance that would call for equitable relief. Because our holding rests on the absence of the factors necessary under equitable principles to justify federal intervention, we have no occasion to consider whether 28 U.S.C. s 2283, which prohibits an injunction against state court proceedings 'except as expressly authorized by Act of Congress' would in and of itself be controlling under the circumstances of this case.

The judgment of the District Court is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

Reversed.

*56 Mr. Justice BRENNAN with whom Mr. Justice WHITE and Mr. Justice MARSHALL join, concurring in the result.

I agree that the judgment of the District Court should be reversed. Appellee Harris had been

indicted for violations of the California Criminal Syndicalism Act before he sued in federal court. He has not alleged that the prosecution was brought in bad faith to harass him. His constitutional contentions may be adequately adjudicated *57 in the state criminal proceeding, and federal intervention at his instance was therefore improper.

**756 Appellees Hirsch and Dan have alleged that they 'feel inhibited' by the statute and the prosecution of Harris from advocating the program of the Progressive Labor Party. Appellee Broslawsky has alleged that he 'is uncertain' whether as an instructor in college history he can under the statute give instruction relating to the Communist Manifesto and similar revolutionary works. None of these appellees has stated any ground for a reasonable expectation that he will actually be prosecuted under the statute for taking the actions contemplated. The court below expressly declined to rely on any finding 'that * * * Dan, Hirsch or Broslawsky stand(s) in any danger of prosecution by the (State), because of the activities that they ascribed to themselves in the complaint *58 * * *.' 281 F.Supp. 507, 516. It is true, as the court below pointed out, that '(w)ell-intentioned prosecutors and judicial safeguards do not neutralize the vice of a vague law,' Baggett v. Bullitt, 377 U.S. 360, 373, 84 S.Ct. 1316, 1323, 12 L.Ed.2d 377 (1964), but still there must be a live controversy under Art. III. No threats of prosecution of these appellees are alleged. Although Dan and Hirsch have alleged that they desire to advocate doctrines of the Progressive Labor Party, they have not asserted that their advocacy will be of the same genre as that which brought on the prosecution of Harris. In short, there is no reason to think that California has any ripe controversy with them. See Golden v. Zwickler, 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969); Perez v. Ledesma, 401 U.S. 82, p. 93, 91 S.Ct. 674, p. 681, 27 L.Ed.2d 701 (Brennan, J., concurring and dissenting).

**All Citations**

401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669

### Footnotes

1  's 11400. Definition
"Criminal syndicalism' as used in this article means any doctrine or precept advocating, teaching or aiding and abetting the commission of crime, sabotage (which word is hereby defined as meaning wilful and malicious physical damage or injury to physical property), or unlawful acts of force and violence or unlawful methods of terrorism as a means of accomplishing a change in industrial ownership or control, or effecting any political change.'
's 11401. Offense; punishment
'Any person who:
'1. By spoken or written words or personal conduct advocates, teaches or aids and abets criminal syndicalism or the duty, necessity or propriety of committing crime, sabotage, violence or any unlawful method of terrorism as a means of accomplishing a change in industrial ownership or control, or effecting any political change; or
'2. Wilfully and deliberately by spoken or written words justifies or attempts to justify criminal syndicalism or the commission or attempt to commit crime, sabotage, violence or unlawful methods of terrorism with intent to approve, advocate or further the doctrine of criminal syndicalism; or
'3. Prints, publishes, edits, issues or circulates or publicly displays any book, paper, pamphlet, document, poster or written or printed matter in any other form, containing or carrying written or printed advocacy, teaching, or aid and abetment of, or advising, criminal syndicalism; or
'4. Organizes or assists in organizing, or is or knowingly becomes a member of, any organization, society, group or assemblage of persons organized or assembled to advocate, teach or aid and abet criminal syndicalism; or
'5. Wilfully by personal act or conduct, practices or commits any act advised, advocated, taught or aided and abetted by the doctrine or precept of criminal syndicalism, with intent to accomplish a change in industrial ownership or control, or effecting any political change;
'Is guilty of a felony and punishable by imprisonment in the state prison not less than one nor more than 14 years.'

2  Appellees did not explicitly ask for a declaratory judgment in their complaint. They did, however, ask the District Court to grant 'such other and further relief as to the Court may seem just and proper,' and the District Court in fact

| | |
|---|---|
| | granted a declaratory judgment. For the reasons stated in our opinion today in Samuels v. Mackell, **401 U.S.** 66, 91 S.Ct. 764, 27 L.Ed.2d 688, we hold that declaratory relief is also improper when a prosecution involving the challenged statute is pending in state court at the time the federal suit is initiated. |
| 3 | For an interesting discussion of the history of this congressional policy up to 1941, see Toucey v. New York Life Ins. Co., 314 **U.S.** 118, 62 S.Ct. 139, 86 L.Ed. 100 (1941). |
| 4 | Neither the cases dealing with standing to raise claims of vagueness or overbreadth, e.g., Thornhill v. Alabama, 310 **U.S.** 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940), nor the loyalty oath cases, e.g., Baggett v. Bullitt, 377 **U.S.** 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964), changed the basic principles governing the propriety of injunctions against state criminal prosecutions. In the standing cases we allowed attacks on overly broad or vague statutes in the absence of any showing that the defendant's conduct could not be regulated by some properly drawn statute. But in each of these cases the statute was not merely vague or overly broad 'on its face'; the statute was held to be vague or overly broad as construed and applied to a particular defendant in a particular case. If the statute had been too vague as written but sufficiently narrow as applied, prosecutions and convictions under it would ordinarily have been permissible. See Dombrowski, supra, 380 **U.S.**, at 491 n. 7, 85 S.Ct., at 1123.<br>In Baggett and similar cases we enjoined state officials from discharging employees who failed to take certain loyalty oaths. We held that the States were without power to exact the promises involved, with their vague and uncertain content concerning advocacy and political association, as a condition of employment. Apart from the fact that any plaintiff discharged for exercising his constitutional right to refuse to take the oath would have had no adequate remedy at law, the relief sought was of course the kind that raises no special problem—an injunction against allegedly unconstitutional state action (discharging the employees) that is not part of a criminal prosecution. |
| 5 | See 1 The Records of the Federal Convention of 1787 p. 21 (Farrand ed. 1911). |
| * | The District Court erroneously interpreted Zwickler v. Koota, 389 **U.S.** 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967), as authorizing federal court consideration of a constitutional claim at issue in a pending state proceeding, whether or not the federal court plaintiff had presented his claim to the state court. It suffices here to note that in Zwickler no state proceeding was pending at the time jurisdiction attached in the federal court. The court below also thought it significant that appellee **Harris** had raised his constitutional claim in the state courts in a motion to dismiss the indictment and in petitions in the state appellate courts for a writ of prohibition. It was questioned at oral argument whether constitutional issues could properly be raised by the procedures invoked by **Harris**, and it was suggested that the denial of **Harris'** motions did not necessarily involve rejection of his constitutional claims. However, even if the California courts had at that interlocutory stage rejected **Harris'** constitutional arguments, that rejection would not have provided a justification for intervening by the District Court. **Harris** could have sought direct review of that rejection of his constitutional claims or he could have renewed the claims in requests for instructions, and on direct review of any conviction in the state courts and in this Court. These were the proper modes for presentation and these the proper formers for consideration of the constitutional issues. |

**End of Document** © 2016 Thomson Reuters. No claim to original U.S. Government Works.

